FILED
2010 Jul-07  PM 03:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| TERESA NAIL, | ) | |
| PLAINTIFF, | ) | |
| VS. | ) | 2:09-cv-1539-JHH |
| STANDARD INSURANCE CO., | ) | |
| DEFENDANT. | ) | |

## MEMORANDUM OF DECISION

The court has before it the March 9, 2010 motion (doc. # 15) of defendant Standard Insurance Company ("Standard") for summary judgment. Pursuant to the court's March 9, 2010 (doc. #18), March 23, 2010 (doc. #20) and April 27, 2010 (doc. #23) orders, the motion was deemed submitted, without oral argument, on May 20, 2010. Based on the submission of the parties and a thorough review of the administrative record, the court concludes that Standard is entitled to judgment as a matter of law.

## I. Procedural History

In this case, Plaintiff Teresa Nail seeks to recover benefits from a long-term disability policy ("the Policy") provided as part of an employee welfare benefits plan

("the Plan") sponsored by her employer, Bradley, Arant, Rose & White, LLP, and administered by Defendant Standard Insurance Company.  Nail commenced this action on July 31, 2009 by filing a complaint in this court alleging a violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1002(1). Defendant's  motion for summary judgment asserts that there are no disputes of material fact, and that Defendant is entitled to judgment as a matter of law.

Both parties have filed briefs[1] and submitted evidence in support of their respective positions.  Defendant submitted a brief (docs. # 16 & 29) and evidence[2] (docs. # 16 & 17) in support of its own motion for summary judgment on March 9, 2010.  On April 13, 2020, plaintiff filed a brief and evidence[3] (docs. # 21 & 30) in opposition to defendant's motion for summary judgment.  On May 11, 2010, defendant filed a brief (doc. # 25) in reply to plaintiff's opposition.  The motion is now under submission, without oral argument.

---

[1] The court notes that both parties were required to re-submit briefs to the court because of lack of citation to the record in the statement of facts.  (See doc. # 28.)

[2] The defendant submitted the following evidence: affidavit of Sandra K. Bertha; copy of the administrative record, including the Group policy and the claim file assembled by Standard in connection with Nail's claim for long-term disability benefits.

[3] The plaintiff submitted the following evidence: affidavit of Teresa Nail; January 6, 2006 notice from the Social Security Administration granting disability benefits; notice of deposition(s).

## II. Relevant Undisputed Facts

Plaintiff Teresa Nail was employed by the law firm Bradley, Arant, Rose & White, LLP ("Bradley Arant") as a receptionist and conference center coordinator. (Def. Ex. 2 at STND 1460-00801.) According to her job description, Nail's duties included "perform[ing] general receptionist duties of greeting clients and visitors, answering and routing telephone calls as appropriate, taking and relaying messages to all firm employees and attorneys."[4] (Id. at STND 1460-00817.) The qualifications for the job included a high school diploma or the equivalent, a pleasant "telephone voice", a professional and courteous manner, punctuality and regular attendance, and grooming and dress consistent with the professional image of Bradley Arant. (Id.) With respect to the physical demands of her position as a receptionist and conference room coordinator, the position did not require any heavy lifting, but did require that Nail be able to sit for several hours. (Id.)

### A.  The Standard Group Policy and Plan

Effective May 1, 2002, Standard issued a group policy to Bradley Arant to fund

---

[4] She was also responsible for (1) greeting walk-in visitors in a courteous manner, determining their needs and promptly notifying the appropriate person, including operating the paging system; (2) directing visitors to beverage station; (3) answering in-coming calls and directing call to appropriate attorney or staff; and (4) receiving hand-delivered items at the receptionist desk and promptly notifying the intended party of the delivery. (Def.'s Ex. 2 at STND 1460-00817.)

long-term disability benefits under the Plan. (Bertha Aff. at   ¶ 4.) Nail was a

participant in the Plan, and was covered under the group policy. (Bertha Aff. at ¶ 7.)

According to the group policy, there are five classes of employees covered under the

Plan.  (Def. Ex. 2 at STND 1460-00011.)   Nail's employment falls under Class 5,

entitled "All other Members (not Partners, Of Counsel, Associates, Firm Directors or

Department Managers)."  (Id. at STND 1460-00011.) Under that class, the policy

provides two separate definitions for the term disability.  During the first twenty-four

months,Nail was covered for long-term disability benefits based on an "Own

Occupation" definition of disability.  (Id. at STND 1460-00011-00012.)  The policy

defined "Own Occupation" disability as follows:

> You are Disabled from your Own Occupation if, as a result of Physical
> Disease, Injury, Pregnancy or Mental Disorder:
>
> 1.  You are unable to perform with reasonable continuity the Material
> Duties of your Own Occupation; and
> 2.   You suffer a loss of at least 20% in your Indexed Predisability
> Earnings when working in your Own Occupation.
>
> Note: You are not Disabled merely because your right to perform your
> Own Occupation is restricted, including a restriction or loss of license.
> . . .
> Own Occupation means any employment, business, trade, profession,
> calling or vocation that involves Material Duties of the same general
> character as the occupation you are regularly performing for your
> Employer when Disability begins.   In determining your Own
> Occupation, we are not limited to looking at the way you perform your
> job for your Employer, but we may also look at the way the occupation

4

is generally performed in the national economy. . . .

(Id. at STND 1460-00017.)  After the first two years of coverage, the definition shifts

to an "Any Occupation" definition of disability. (Id. at STND 1460-00011- 00012.)

The policy provided for the following "Any Occupation" definition of disability:

> During the Any Occupation Period you are required to be Disabled from all occupations.
>
> You are Disabled from all occupations if, as a result of Physical Disease, Injury, Pregnancy or Mental Disorder, you are unable to perform with reasonable continuity the Material Duties of Any Occupation.
>
> Any Occupation means any occupation or employment which you are able to perform, whether due to education, training, or experience, which is available at one or more locations in the national economy and in which you can be expected to earn at least 60% of your Indexed Predisability Earnings within twelve months following your return to work, regardless of whether you are working in that or any other occupation.

(Id. at STND 1460-00018.)

B. Nail's Claim for Long-Term Disability Benefits

In 1996, Nail underwent a second[5] surgery on her neck to repair two ruptured

disks.  (Id. at STND 1460-00073; Nail Aff. ¶ 5.) She returned to work sometime after

the surgery, although she had limited movement in her neck.  (Nail Aff. ¶ 5.) Then,

in approximately June 2004, Nail began experiencing numbness in her left leg.

---

[5] Apparently Nail first had surgery on her neck in the late 1980s or early 1990s.  (Def.'s Ex. 2 at STND 1460-00773.)

(Def.'s Ex. 2 at STND 1460-00073; Nail Aff. ¶ 6.) Her neurologist, Dr. Robert Q. Craddock, performed an MRI, and informed Nail that she needed surgery to treat degenerative spondylothesis with spinal stenosis at the L4-5 level.  (Nail Aff. ¶ 6.) On February 23, 2005, Nail underwent a two-level lumbar spine fusion surgery, or a "bilateral lumbar discectomy with interbody  fusion and posterior lateral instrumented arthrodesis."  (Id.; Def.'s Ex. 2 at STND 1460-00114 & 00769.) Because of continued severe pain in her lower back and legs, Nail was unable to return to work following the procedure.  (Nail Aff. ¶ 7.)

In June 2005, Nail submitted a claim for long-term disability benefits under the Plan based on the two-level lumbar spine fusion without complications.[6] (Id. at STND 1460-00786-00797.)   Shortly thereafter, on July 6, 2005, Standard's claim analyst recommended approving Nail's claim based on a review of the medical records by a nurse case manager who concluded that it was reasonable that Nail was unable to sit or stand for prolonged periods due to pain. (Id. at STND 1460-00589.)

---

[6] In addition to applying for benefits under the Plan, Nail applied for Social Security disability benefits.  She was initially denied benefits and appealed on July 28, 2005.  (Def.'s Ex. 2 at STND 1460-00843.)  Her attorney obtained medical information to aid her appeal, including a letter dated August 22, 2005, addressed "To Whom It May Concern" from Dr. Craddock which stated: "In my opinion, Ms. Nail is completely and totally disabled from carrying on any gainful employment due to her spinal problems.  Please consider her for Social Security benefits. I have filled out the requested forms and enclosed them in this letter." (Id. at STND 1460-00310.)  Upon reconsideration, the Social Security Administration determined that Nail was disabled under the Social Security Act as of February 18, 2005. (Id. at STND 1460-00834.)

6

The nurse also recommended requesting updated records at the end of August as Nail's condition might improve. (Id.)  Standard approved Nail's claim for long-term disability benefits  by letter dated July 6, 2005.  (Id. at STND 1460-00590.)

After initial granting benefits in July 2005, Standard apparently followed up on Nail's condition as suggested by the nurse case manager.  On September 23, 2005, Dr. Craddock submitted an Attending Physician Statement ("APS") to Standard which stated that Nail was disabled and could not do any type of work, and that he did not anticipate her ever being able to return to work.  (Id. at STND 1460-00448.) Similarly, pain management specialist Dr. David W. Cosgrove  submitted an APS dated May 10, 2006, and reported a primary diagnosis of Postoperative Radiculitis - cervical, and a secondary diagnosis of Postoperative Radiculitis - Lumbar. (Id. at STND 1460-00441.)  Dr. Cosgrove stated that Nail would "not be able to sustain permanent employment even at a sedentary level for her lifetime."  (Id. at STND 1460-00441.)   On June 6, 2006, Standard informed Nail that the definition of disability under the policy would change to the inability to perform any occupation as of May 19, 2007. (Id. at STND 1460-00712 - 00715.)

C.  Standard's Re-Evaluation of Nail's Benefits

In  2007, Standard began a thorough review of Nail's status and notified Nail that "it would re-evaluate [her] claim to see if [she] continued to be disabled under

the terms of the policy." (Nail Aff. ¶ 8.)  That re-evaluation began with the January

2, 2007 review of  Nail's  medical records by board certified Physiatrist Dr. Hans

Carlson.  (Def.'s Ex. 2 at STND 1460-00398 - 00399.) Dr. Carlson opined that Nail

"would be able to perform sedentary activity on a full-time basis with reasonable

limitations and restrictions of no continuous bending, stooping, twisting, squatting

activities." (Id. at STND 1460-00398.)  Dr. Carlson anticipated that Nail would "be

able to stand and walk on an occasional basis," and would be best with the ability to

reposition as tolerated from a sitting to standing position. (Id. at STND 1460-00398

- 00399.)  Dr. Carlson noted that Nail's records showed chronic symptoms since the

surgery in February 2005, without significant changes. (Id. at STND 1460-00399.)

He opined that her "prognosis is fair at best . . . [for] any significant improvement

with respect to her symptoms based on the chronicity and duration of the symptoms

she has had this far out from her surgery." (Id.)  Finally, Dr. Carlson noted that the

records suggested a possible component of depression,[7] which might warrant

obtaining further records to be reviewed by a psychiatrist.  (Id.)

As a result of Dr. Carlson's suggestion, Nail's records were reviewed by board

certified psychiatrist and neurologist Dr. Esther Gwinnell on February 7, 2007.  (Id.

---

[7]  In a telephone conversation on February 5, 2007, Nail confirmed that she was taking
Paxil for anxiety, and that she was taking medication for a high heart rate which might be the
result of anxiety over continued back pain. (Id. at STND 1460-00392.)

at STND 1460- 00384.)  Dr. Gwinnell's report stated that although there were "brief references by treating physicians to Ms. Nail's level of anxiety and depression" in the claim file, the doctors never "actually describing that depression or anxiety, listing symptoms, severity of symptoms, prevalence of symptoms, or other mental status information." (Id.) Therefore, Dr. Grinnel concluded that "Ms. Nail does have some complaints of anxiety and depression, but at no time does the documentation support that this depression or anxiety has ever risen to a level which would prevent Ms. Nail from functioning in any occupation for which she was physically capable."[8] (Id.)

On April 18, 2007, Standard began an "any occupation vocational review" of Nail's claim file. (Id. at STND 1460-00809 - 00810.)  The assumed limitations and restrictions were as follows: (1) sedentary work level only with  no continuous bending; (2) standing and walking occasionally; and (3) change of position as needed for comfort.  (Id.) As part of that review Vocational Case Manager Laura Willis, M.Ed., CRC, completed a Transferrable Skills Assessment ("TSA") on April 27, 2007. (Id. at STND 1460-00801 - 00805.)  Willis concluded that "[c]onsidering the restrictions noted above the claimant can perform her own occupation as a

---

[8] On April 10, 2007, after receiving and reviewing additional records from February and March 2007, Dr. Carlson provided an addendum to his report stating that the new records did not change his prior conclusions regarding reasonable restrictions and limitations. (Def.'s Ex. 2 at STND 1460-00363.)

Receptionist." (<u>Id.</u> at STND 1460-00805.)  She also identified two other "sedentary level occupations that would allow the claimant to change positions as needed for comfort . . . and do not require continuous bending, stooping, twisting or squatting. Standing and walking is only required on an occasional basis." (<u>Id.</u>)  Those occupations were information clerk and appointment clerk. (<u>Id.</u>) Willis further stated that "[t]hese occupations exist in the . . . labor market in sufficient numbers to allow reentry into the workforce given [Nail's] residual functional capacity and transferable skills" and "are within the same occupational classification as Receptionists and Information Clerks." (<u>Id.</u>) Willis concluded that "[i]t is also reasonable that Ms. Nail could obtain the target wage within one year of hire. . . ." (<u>Id.</u>)

In July 2007, after receiving the TSA, Standard requested that Nail undergo an independent medical examination ("IME"). (<u>Id.</u> at STND 1460-00687.)  On August, 29, 2007,  Dr. Jack Denver, board certified in pain medicine and spinal cord medicine, performed an IME of Nail. (<u>Id.</u> at STND 1460-00334 - 00340.)  Dr. Denver reviewed Nail's history of present illness, current description of pain, functional history, past medical history, current medications, social history, occupational history, medical records,[9] and diagnostic studies. (<u>Id.</u> at STND

---

[9] Dr. Denver's review of the medical documentation in Nail's claim file did not reveal "significant objective findings." (Def.'s Ex. 2 at STND 1460-00339.) He noted "that the range of motion examination by Dr. Craddock on 5/24/05 was abnormal but this was also only a couple of

1460-00334 - 00340.)  Dr. Denver also physically examined[10] Nail, and reported, in part:

> She was observed coming into the office prior to her scheduled time. As she came into the office she did not know that I was the examining physician. She was noted to be walking briskly holding a large purse. There did not appear to be any biomechanical abnormalities with regard to gait and station. There was no evidence of a lateral shift or any pain behavior noted. She presented well-dressed, well-groomed, and overweight. Speech was noted to be tangential.  She was somewhat restless and was noted to have a labile affect.  Formal gait analysis revealed that her gait was significantly slower with increased lateral sway.  She was much more pain-focused and apprehensive during formal gait analysis and appeared much different than when she was unaware of my observations prior to the formal examination. She was asked to squat and perform stooping which she performed through 80% of the range of motion with fairly good biomechanics.
>
> She performed kneeling down towards her left knee and then did it on the right with 90% of the motion performed.  She was able to perform bending through the full range of motion at her waist. . . . Sensation: Decreased right S1 sensation. Motor: She displayed extremely poor effort. When asked to provide stronger resistance, she obviously was not trying. This was true for manual muscle testing of both upper and lower extremities. Her strength observed in a functional matter during gait and other activities described above would minimally give her manual muscle testing scores of 4/5 or greater.  No focal motor deficits were noted.  Lumbosacral range of motion was also noted to be a very self-limited effort as she greatly exceeded the range of motion during

---

months after having undergone back surgery." (Id.)  Moreover, "[d]espite these abnormalities, her lumbosacral range of motion is still within acceptable limits for performing her occupation within a sedentary demand work level." (Id.)

[10] Nail contends that Dr. Denver did not ask her many questions or take much time examining her, and that her best recollection was that she was in Dr. Denver's office for a total of twenty (20) minutes.  (Nail Aff. ¶ 9.)

functional activities than during formal range of motion testing. . . .

(Id. at STND 1460-00337 - 00338.)

Dr. Denver diagnosed Nail with an "L4-5 grade I spondylolisthesis and cervical disc disease status post anterior cervical diskectomy and fusion in 1989 and 1996" based on the medical records and his physical examination(Id. at STND 1460-00338.)   Dr. Denver provided the following physical restrictions and limitations:

- sitting, standing and walking unrestricted
- occasionally lifting and carrying 10 pounds
- occasionally pushing and pulling 20 pounds or frequently pushing and pulling 10 pounds
- occasional bending, stooping, kneeling, squatting
- unrestricted for upper extremity gross and fine motor movements, including reaching with the exception of overhead reaching restricted to occasionally
- overhead work restricted to rarely
- climbing ladders and balancing totally restricted

(Id.)  Dr. Denver also commented on the severity of Nails's functional limitations based on the records and his exam.  (Id. at STND 1460-00339.)  With regard to her daily activities, Dr. Denver noted that Nail reported that "she is limited in cleaning her house, performing laundry tasks, working in the yard, driving a car, mopping, vacuuming, or leaning over to clean a tub.  She also report[ed] . . . trouble holding her arms up to shampoo her hair, requiring assistance from her husband."  (Id.)

12

Further, Dr. Denver commented on the large discrepancy between Nail's "gait pattern witnessed before the examination started and . . . [her] formal gait assessment (during the examination)." (Id.) Dr. Denver opined that Nail's "extraordinarily limited range of motion exam and her extremely poor effort during manual muscle testing suggests that she is attempting to influence the outcome of this examination."[11] (Id.) He noted that although Nail "provided very poor volitional effort," "[n]o significant focal deficits were noted. She also performed range of motion much better during functional activities such as kneeling, squatting, bending, and stooping. In addition, she has undergone successful cervical and lumbar surgeries and there is no evidence of any structural instability or objective finding noted on physical examination that would support her subjective limitations." (Id. at STND 1460-00339.)

Despite the IME, Dr. Craddock continued in his opinion that Nail was completely disabled and unable to work. On September 20, 2007, Dr. Craddock submitted an APS dated stating his continued opinion that plaintiff was "disabled from working" and would never be able to return to work. (Id. at STND 1460-00320.) Dr. Craddock also provided a "Physician's Report - Musculoskeletal" on which he

_____

[11] Nail disagrees with Dr. Denver's assessment and testified that she "did not behave differently when entering the office nor did she limit her efforts during the short time with him." (Nail Aff. ¶ 10.)

13

reported that Nail could occasionally sit, stand, walk, balance, walk on uneven surface, climb stairs, reach at shoulder level, reach above shoulder level, and drive an automatic transmission vehicle, but could never bend, kneel, crawl, or drive a vehicle with a manual transmission "due to pain." (Id. at STND 1460-00316 - 00318.) Further, Dr. Craddock stated that Nail could frequently lift 1 to 10 pounds, but no more than that due to pain, could not carry any amount of weight due to pain, and could frequently push or pull 1 to 10 pounds, but no more than that due to pain. (Id. at STND 1460-00317.)  One month later, on October 22, 2007, Dr. Craddock submitted another "To Whom It May Concern" in which he stated: "In my opinion, Ms. Nail is completely and totally disabled from carrying on any gainful employment and will not be able to return to work."  (Id. at STND 1460-00293.)

Additionally, Nail  submitted documentation from two other doctors, Dr. Walter Dunn and Dr. David W. Cosgrove[12] to support her claim that she could not perform even sedentary work.  On September 18, 2007, Nail submitted a letter from Dr. Cosgrove stating as follows:

> This patient, Ms. Teresa Nail, is a woman I have been treating for chronic pain  She has undergone surgical interventions to both the neck and low back.  She suffers unrelenting pain in the neck, back, upper extremities, and lower extremities.  She takes medications for her pain

---

[12] Nail submitted record from Dr. Cosgrove previously in 2006.  (Def.'s Ex. 2 at STND 1460-00440-441.)

14

> that are associated with untoward side effects. She will not be able to
> sustain gainful employment even at the sedentary level for the remainder
> of her life.

(Id. at STND 1460-00324.) Similarly, Nail submitted a "Physician's Report -
Musculoskeletal" completed by Dr. Walter Dunn which stated that Nail was limited
per Dr. Craddock's restrictions and limitations. (Id. at STND 1460-00313 - 00315.)

On December 20, 2007, Dr. Carlson again reviewed Nail's medical records,
including the IME report. (Id. at STND 1460-00296-00298.) He noted that there
were no clinical notes after August 29, 2007, and no more recent physical findings
since the IME that determined Nail was incapable of sedentary work. (Id. at STND
1460-00297.) Dr. Carlson stated: "I would concur that the individual would be
capable of sedentary-level activity with further limitations and restrictions of no
frequent bending or twisting activities involving the lumbar spine. Furthermore, the
ability to reposition occasionally as needed from sitting to standing and/or walking
would be reasonable limitations and restrictions." (Id. at STND 1460- 00298.) Dr.
Carlson also reviewed additional notes regarding steroid injections, as well as the
October 22, 2007 letter from Dr. Craddock and advised that the new records with
respect to her lumbar spine condition did not alter his conclusions regarding
restrictions and limitations. (Id. at STND 1460-00268. )

## D.  Standard's Denial of Benefits and Nail's Appeal

Based on the results of the IME and the other information in the file, Standard determined that Nail was not disabled from her own occupation or all occupations. (Id. at STND 1460-00592 - 00598.) By letter dated June 3, 2008, Standard informed Nail that its review had determined that she was not disabled from her own occupation or any occupation with reasonable continuity. (Id.) Standard advised Nail of her right to appeal its determination.[13] (Id. at STND 1460-00597.)

Nail retained an attorney and appealed the denial decision.  Her attorney submitted additional records from Dr. Craddock on December 8, 2008 and advised that the documents completed her submissions in support of the appeal. (Id. at STND 1460-00541.) In addition to the medical records, Nail's attorney submitted a Vocational Assessment Report dated November 5, 2008. (Id. at STND 1460-00555 - 00558.) The vocational report stated :

> Taking into account the medical evidence in Mrs. Nail's case, her age, educational background and work history in conjunction with her physical limitations, chronic pain and prescription medications it is my opinion she is permanently and totally disabled from any form of sustained gainful employment. Based on her treating physician's records Mrs. Nail cannot perform her occupation, or any other occupation.

---

[13]   After the denial, on June 24, 2008, Dr. Craddock wrote a third "To Whom It May Concern" letter, again stating: "In my opinion, Ms. Nail continues to be completely and totally disabled from carrying on any gainful employment. I have advised her to continue on with pain management." (Id. at STND 1460-00183.)

(Id. at STND 1460-00557.) Additionally, a Functional Capacity Questionnaire completed by Dr. Craddock on November 22, 2008 indicated that Nail could only sit or stand for 30 minutes at a time, for a total of 2 hours a day, and that she was in constant pain that would interfere with her ability to concentrate. (Id. at STND 1460-00547 - 00553.)

Standard acknowledged Nail's appeal of the denial of benefits by letter dated December 11, 2008. (Id. at STND 1460-00541.) On December 31, 2008, Standard advised Nails that an extension was necessary in order to obtain review by a Physician Consultant. (Id. at STND 1460-00540.) By letter dated January 21, 2009, Standard asked Nail to provide updated medical records from Dr. Craddock and Dr. Cosgrove. (Id. at STND 1460-00534 - 00535.)  After not receiving a reply, on February 11, 2009, Standard again asked for an update on the status of the requested records. (Id. at STND 1460-00533.) Nail's attorney responded on February 17, 2009, and enclosed some of the requested records from Dr. Cosgrove, but stated that she was still waiting on a response from Dr. Craddock. (Id. at STND 1460-00530 - 00531.) Standard followed up again on March 4 and March 25, 2009, to determine whether Nail had any other records from Dr. Craddock, whether additional time would be needed, or whether she wished for a final determination to be made without those records.  (Id. at STND 1460-00527 and 00529.)

17

When Standard did not received a response by April 15, 2009, it advised Nail that that the appeal would proceed on April 29, 2009. (Id. at STND 1460-00524.) By letter dated April 29, 2009, Nail's attorney confirmed a telephone conversation with Standard, in which Standard's appeal analyst stated her intention to prepare the file for review by a physician, and the attorney stated that she would make a final attempt to get the requested records from Dr. Craddock. (Id. at STND 1460-00521 - 00522.) By letter dated May 20, 2009, Standard informed Nail that the claim file had been referred to a board certified neurosurgeon for an independent medical review of all available medical documentation. (Id. at STND 1460-00518.)

Nail's entire file was reviewed by Dr. Deepak Awasthi, board certified in neurological surgery, on or around May 28, 2009. (Id. at STND 1460-00113 - 00117.) Dr. Awasthi stated that the medical records showed chronic neck and low back pain that had waxed and waned or remained the same, but had not worsened or improved. (Id. at STND 1460-00115.) He concluded that Nail's neck pain did not preclude her ability to perform sedentary work after May 19, 2008. (Id.) Additionally, Dr. Awasthi did not believe the medical records provided substantial evidence of a considerable worsening of Nail's low back pain after the reasonable recovery period from her surgery in February 2005. (Id.)

With regard to diagnostic studies, Dr. Awasthi stated that "[t]he only

documented diagnostic studies are plain x-rays of the lumbar spine (including the one done on 6/17/08) which reveal no instability postoperatively. Furthermore, on 6/24/08, Dr. Craddock stated that there were no further surgical issues in a lumbar MRI scan done in 6/08." (Id.)  Therefore, Dr. Awasthi concluded that "[a]ll these [studies] point out that the claimant can perform her work duties. Furthermore, the main objective (clinical) findings in the spine are that of limited range of motion; muscle spasms. This, along with the cervical and lumbar fusion, can limit the claimant's activities to some extent. However, she should be able to perform sedentary type work." (Id.)

Dr. Awasthi did not find any documentation in their contemporaneous medical records of any cognitive dysfunction or problems with concentration, fatigue or drowsiness due to medications. (Id. at STND 1460-00116.) Dr. Awasthi opined that "[t]he medical records do not bear out that the claimant's condition or symptoms are of a severity that impaired her ability to perform sedentary work with the ability to change positions for any duration after 5/19/08," and that "the opinions of Dr. Cosgrove and Dr. Craddock are not corroborated by the collective medical evidence." (Id.)

By letter dated June 12, 2009, Standard advised Nail that it had completed the appeal review of Nail's claim, and that careful consideration of all information in the

19

administrative record confirmed that the decision to terminate benefits was correct. (Id. at STND 1460-00492 - 00512.) Standard further advised that administrative remedies under the Plan had been exhausted. (Id. at STND 1460- 00512.)

That same day, by letter dated June 12, 2009, Nail's attorney submitted records from Dr. Barranco and Dr. Dunn, and stated that she was still attempting to get information from Dr. Craddock. (Id. at STND 1460-00485 - 00486.) Three days later, Nail's attorney stated that she intended to have two additional treating physicians complete physical capacity evaluations, in hopes that they could be reviewed in lieu of Dr. Craddock's records, since he was retired. (Id. at STND 1460-00489 - 00491.) Standard responded on June 17, 2009, and explained that the recent submissions must have crossed in the mail with the final decision letter, but that the administrative process was complete. (Id. at STND 1460-00480 - 00481.) Further, with respect to new complaints, Standard noted that Nail's coverage under the group policy ended some time before and she would not be eligible for benefits as a result of any new or recent disability. (Id.) Standard concluded that because "the independent administrative review of Ms. Nail's claim [is] now complete, current medical documentation providing evidence of a possible new cause of disability, and questionnaires completed by treating physicians would not prove helpful in substantiating that Ms. Nail remained disabled as of May 19, 2008, the date her claim

20

closed, in the absence of substantive medical evidence contemporaneous to that date."

(Id. at STND 1460-00481.)  The instant complaint followed on July 31, 2009.

## III.  ERISA Standard of Review

Because ERISA provides no standard for reviewing decisions of plan administrators or fiduciaries, the court must look to the plan documents to determine the applicable standard of review.  See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 (1989).  Three distinct standards for reviewing a plan administrator's decision apply, depending on the language of the plan documents: (1) de novo where the plan does not grant the administrator discretion; (2) arbitrary and capricious where the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where the plan grants the administrator discretion and the administrator has a conflict of interest.  See id.; HCA Health Servs. of Georgia., Inc. v. Employers Health Ins. Co., 240 F.3d 982, 993 (11th Cir. 2001).  The Eleventh Circuit has expanded the above test into a six-step test that a district court must follow whenever it reviews an administrator's decision:

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims;

if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

Capone v. Aetna Life Ins. Co., 592 F.3d 1189, 1195 (11th Cir. 2010) (citing

Williams v. BellSouth Telecomms., Inc., 373 F.3d 1132, 1138 (11th Cir. 2004),

overruled on other grounds by Doyle v. Liberty Life Assurance Co. of Boston, 542

F.3d 1352, 1358-57 (11th Cir. 2008)).

The Eleventh Circuit recently eliminated the heightened standard of review

applicable when a conflict of interest is present as to the sixth step in the above

analysis in Doyle v. Liberty Life Assurance Co. of Boston, 542 F.3d 1352, 1360 (11th

Cir. 2008). Specifically, the Eleventh Circuit noted that the Supreme Court in

Metropolitan Life Insurance Co. v. Glenn, 498 U .S. 101 (2008) called into question

the heightened arbitrary and capricious standard employed in the Eleventh Circuit.

Doyle, 542 F.3d at 1360. In Doyle, the Eleventh Circuit recognized that Glenn

implicitly overruled circuit precedent to "the extent it requires district courts to review benefit determinations by a conflicted administrator under the heightened standard" with the burden shifting requirement. Capone, 592 F.3d 1189, 1195 (11th Cir. 2010) (citing Doyle, 542 F.3d at 1360).

"Instead," the Court held, "'the existence of a conflict of interest should merely be a factor for the district court to take into account when determining whether an administrator's decision was arbitrary and capricious.'" Id. at 1196 (quoting Doyle, 542 F.3d at 1360). The Court further held that, while the reviewing court must take into account an administrative conflict when determining whether an administrator's decision was arbitrary and capricious, "the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." Id. (quoting Doyle, 542 F.3d at 1360). Even where there is a conflict of interest, courts still "owe deference" to the administrator's "discretionary decision-making." Doyle, 542 F .3d at 1363. Thus, the Williams methodology remains intact except for the sixth step, as modified by Glenn. See Capone, 592 F.3d at 1196.

In this case, the Standard policy expressly grants discretionary authority to Standard "to administer claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group

23

Policy." (Def.'s Ex. 2 at STND 1460-00032.) Because of this language, the applicable standard of review for the court in reviewing the decision made by Standard to terminate Plaintiff's benefits is the arbitrary and capricious standard. This seems to be undisputed between the parties.

The court notes the incongruity between the summary judgment standard set forth in Federal Rule of Civil Procedure 56 and the ERISA standard of review. Compare Fed.R.Civ.P. 56(c) and Williams, 373 F.3d at 1138; see also Leahy v. Raytheon Co., 315 F.3d 11, 17 (1st Cir. 2002). The Eleventh Circuit charges the district court with determining de novo whether the administrator's decision was wrong, Williams, 373 F.3d at 1138, rather than whether there are questions of material fact that require trial and whether the parties are entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c).

## IV. Applicable Substantive Law and Analysis

At the outset, the court notes that Standard moves for summary judgment on the de novo step of the Williams analysis only. (See docs. #15, 16 & 25.) Standard did not move for summary judgment on the remaining prongs of the arbitrary and capricious standard of review, and the time to do so has expired. (See doc. # 12.) Accordingly, if the court finds that the decision made by Standard was de novo correct, Standard is entitled to summary judgment, Williams, 373 U.S. at 1138;

however, if the court finds the decision was wrong, this case is headed for a bench trial.

The only question the court must answer in this case, therefore, is whether Standard's decision to terminate Nail's benefits was "de novo wrong." Capone, 592 F.3d at 1195. "A decision is 'wrong' if, after a review of the decision of the administrator from a de novo perspective, the court disagrees with the administrator's decision." Glazer v. Reliance Standard Life Ins. Co., 524 F.3d 1241, 1246 (11th Cir. 2008) (internal quotation marks omitted). Thus, the court "must consider, based on the record before the administrator at the time its decision was made, whether the court would reach the same decision as the administrator." Id. at 1246. In other words, the court must "stand in the shoes of the administrator and start from scratch, examining all the evidence before the administrator as if the issue had not been decided previously." Stiltz v. Metropolitan Life Ins. Co., 2006 WL 2534406, at *6 (N.D.Ga. Aug.30, 2006), aff'd 244 Fed. App'x. 260 (11th Cir. 2007). If the court agrees with the administrator's decision, the denial may be affirmed without further inquiry. Id. Particularly in cases such as this one, dealing with injuries resulting in back or neck pain, de novo review presents the unenviable task of weighing and evaluating various medical reports and records along with the plaintiff's own inherently subjective representations of pain, to determine whether such pain limits

25

the ability to work.

Here, on <u>de novo</u> review, after a full examination of all the evidence before Standard, the court reaches the same result that Standard reached, and concludes that the evidence favoring a denial of benefits outweighs the evidence that Nail was incapable of performing any occupation for which she was qualified.  There is no doubt that Nail's injuries placed real limitations and restrictions on her and caused her pain and discomfort.  However, that is not the question presented in this case. Instead, the court must decide whether her condition was such that she was unable to perform any work at all.  The evidence persuades the court, as it did Standard, that despite Nail's injuries and pain, she is capable of performing sedentary work.

Standard based its decision on the opinions of four physicians[14] in different specialties, including Dr. Carlson, Dr. Gwinnel, Dr. Denver, and Dr. Awathsi.  All four doctors confirm that while Nail has physical limitations and experiences pain, she is able to perform sedentary work.[15]  Most instructive of the doctors' opinions is the report from Dr. Denver who performed an IME of Nail in August 2007.  Dr.

---

[14] In addition, Standard relied on the TSA completed by Vocational Case Manager Laura Willis, M.Ed., CRC, who concluded that Nail could perform her own occupation as a receptionist, based on her assumed limitations and restrictions.  (Def.'s Ex. 2 at STND 1460-00805.)

[15] For a complete discussion of the findings of each of these doctors, see Section II, Relevant Undisputed Facts, <u>infra</u>.

Denver reviewed Nail's medical files and performed an independent medical examination of Nail.  During the medical examination, Dr. Denver noted poor effort on the part of Nail and got the impression that she was inflating her symptoms in an attempt to "influence the outcome of the examination."  (Def.'s Ex. 2 at STND 1460-00337-00339.)  Dr. Denver specifically noted the large discrepancy in "her gait pattern witnessed before the examination started" while observed in the waiting room and her "formal gait pattern" during the examination.  (Id. at STND 1460-00339.)  As for Nail's  medical records, noting Nail's "successive cervical and lumbar surgeries," Dr. Denver stated that "there is no evidence of any structural instability or objective finding noted on physical examination that would support her subjective limitations."  (Id. at SNTD 1460-00339.)

The findings of Dr. Carlson,[16] Dr. Gwinnel and Dr. Awasthi corroborate Dr.

_____

[16] Nail criticizes Dr. Carlson's opinion and cites other cases in which Dr. Carlson also determined that other claimants were not restricted or limited sufficiently to prevent their return to work.  That Dr. Carlson has made determinations as to other claimants has absolutely no bearing on his opinion in this case, and his opinions as to those other people certainly does not render his opinion in this case any less persuasive.  The court can only assume that this argument is meant to insinuate that Dr. Carlson always reaches the conclusion that a claimant can return to work.  The court refuses to make such a leap, and the cases cited by Nail do not support such an insinuation.  The courts in those cases upheld the denial of benefits, and in each case found that the record supported the conclusions of Dr. Carlson.  See Goff v. Standard Ins. Co., 2008 WL 3539663, at *7 (E.D. Ark. Aug. 11, 2008) (finding Dr. Carlson's opinion "consistent with [a treating physician's] notes and the FCE"); Whitmore v. Standard Ins. Co., 527 F. Supp. 2d 913, 920 (E. D. Mo. 2007) (noting that "[t]he medical record as a whole supports Dr. Carlson's . . . conclusions"); Gutta v. Standard Select Trust Ins., 2006 WL 2644955, at * 28 (N.D. Ill. Sept. 14, 2006) (upholding denial decision).

Denver's conclusions.  In January 2007, Dr. Carlson opined that Nail "would be able to perform sedentary activity on a full-time basis with reasonable limitations and restrictions of no continuous bending, stooping, twisting, [and] squatting activities." (Id. at STND 1460-00398.) He anticipated that Nail would be able to "stand and walk on an occasional basis" in such a job, and could reposition as tolerated from a sitting to standing position.  (Id. at STND 1460-00398-00399.)  Dr. Carlson's opinion did not change later that year, after additional documentation from Dr. Craddock and after the IME by Dr. Denver.  (Id. at STND 1460-00296-00298.)  Dr. Carlson noted that there were no clinical notes after August 29, 2007, an no more recent physical findings since the IME.  (Id. at STND 1460-00297.)  He concurred with Dr. Denver that Nail was capable of sedentary work with "the ability to reposition occasionally as needed from sitting to standing and/or walking would be reasonable limitations and restrictions."  (Id. at STND 1460-00298.)  Clearly, Nail's job as a receptionist would accommodate such restrictions.  (See id. at STND 1460-00817.)

Nail contends, however, that although Standard relied on her doctors' opinions in initially granting her benefits, Standard is now ignoring their opinions that she is unable to work at all.  (Doc. #21 at 12.)  The record simply does not support this argument.  The administrative record makes multiple references to the opinions of Nail's treating doctors, especially to Dr. Craddock.  Standard clearly took these

28

opinions into consideration, but disagreed with their ultimate conclusion.  For instance, Dr. Awasthi concluded after a review of the entire medical file, that although Nail's injuries may produce some discomfort, the pain does not preclude her ability to perform sedentary work.  (Def.'s Ex. 2 at STND 1460-00115.)  His review of the documented diagnostic studies, including one performed in June 2008, indicated no instability postoperatively and no further surgical issues.  (Id.)  Instead, the clinical findings pointed to limited range of motion and muscle spasms.  (Id.)  Dr. Awasthi concluded that these conditions, along with the cervical and lumbar fusion, could limit Nail's activities to some extent, but would not preclude sedentary work. (Id.)  Other than conclusory statements from her doctors, the medical records and objective findings in the record support Dr. Awasthi's ultimate conclusion.

Unlike the plaintiff in Babb v. Metropolitan Life Ins. Co, 2008 WL 4426059 (M.D. Ga. Sept. 25, 2008), a case cited by Nail in support of her argument, Nail has not pointed the court to objective medical findings that would support her contention that she is unable to perform sedentary work.  Instead, Nail highlights her doctor's conclusory statements that she is unable to work in her past position.  Such statements do little to bolster her claim, especially in the face of her IME performed by Dr. Denver.  Further, Nail's argument that Dr. Denver's observed her for only approximately twenty minutes, does not undermine his report and opinion.  First, this

29

testimony from Nail regarding the alleged thoroughness of his examination was not before Standard, as it was presented in an affidavit to this court in opposition to summary judgment.  Second, the report itself covers all potential issues and problems Nail might experience with her back and neck injuries, in light of her past occupation as a receptionist.  Dr. Denver did not simply reject her treating physician's opinions; he considered their opinions, but based on his examination, observations and review of the medical documentation, he disagreed with their opinions for ample reason.

Nothing in ERISA "suggests that plan administrators must accord special deference to the opinions of treating physicians.  Nor does the Act impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831 (2003). An insurer is entitled to weigh the conclusions of an insured's  personal physicians against the conclusions of other professionals, with due regard for the relative qualifications of the various providers and for the objective bases of their opinions. See id.  As stated above, four separate doctors all concluded after a review of the medical evidence that although Nail has physical limitations and experiences pain due to her injuries, she is able to perform sedentary work.

Nail also relies on the opinion of Vocational Consultant Jo Spradling, who she was sent to by her attorney after Standard's denial of her claim and during the appeals

30

period.  (Def.'s Ex. 2 at STND 1460-00555-00558.)  Although Spradling concurred with Nail's treating physicians, according to the report, this concurrence was based on a conversation with Nail regarding her alleged limitations and pain, and review of letters from Dr. Craddock, Dr. Cosgrove and Dr. Dunn, and a review of the IME.  The Vocational Consultant did not reference any objective medical evidence or documentation supporting the conclusions, and offered only conclusory statements of disability.  The report did not add anything new to Nail's medical records, but merely restated Nail's doctor's conclusion and concurred with them without any real evaluation or explanation. Such documentation is unpersuasive when compared with other medical evidence in the administrative record.

Finally, Nail argues that Standard's payment of disability benefits for approximately three years should weigh against its decision to discontinue benefits.  Specifically, Nail contends "[t]he most compelling evidence for finding Defendant Standard's decision to be de novo wrong is the Defendant Standard approved and paid long term disability benefits to Plaintiff Nail for three years on the basis she could not perform her sedentary, full-time job as a receptionist at Bradley Arant."  (Doc. #21 at 11.)  The Eleventh Circuit has never held that prior payment of benefits is a relevant consideration when a court reviews the denial of benefits under ERISA.  See Stiltz v. Metropolitan Life Ins. Co., 244 Fed. Appx. 260, 265 (11th Cir. 2007)

31

(unpublished).  As such, the prior payment of benefits does not create a presumption in favor of continued coverage.

## V.  Conclusion

In summary, the court finds that no material issues of fact remain and that defendant Standard Insurance Company is entitled to judgment as a matter of law as to all claims asserted by Plaintiff Teresa Nail.  A separate order will be entered.

**DONE** this the ___7th___ day of July, 2010.

_____

SENIOR UNITED STATES DISTRICT JUDGE